1
2
3
4
5
6
7
8

THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10

MARTIN and DAYNA PLANCICH,

CASE NO. C14-0681-JCC

Plaintiffs,

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

11
12

v.

13
14
15
16

SKAGIT COUNTY, a Washington State
county; SKAGIT COUNTY SHERIFF'S
OFFICE, a subdivision of Skagit County;
WILLIAM REICHARDT and JANE DOE
REICHARDT, husband and wife; and
TOM MOLITOR and JANE DOE
MOLITOR, husband and wife,

17

Defendants.

18
19
20
21
22
23
24
25
26

This matter was tried to the Court from September 12, 2016 to September 20, 2016. The claim presented for adjudication was whether Defendants violated the First Amendment by retaliating against Plaintiff Martin Plancich for his political speech. The parties stipulate that Plancich engaged in constitutionally protected speech by supporting Defendant William Reichardt's opponent in the 2010 election for Skagit County Sheriff. The parties further stipulate that Defendants took an adverse employment action against Plancich by terminating him from the Skagit County Sheriff's Office ("the SCSO"). Accordingly, the only question before the Court is whether Plancich's speech was a "substantial or motivating factor" for his termination. *See Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 803 (9th Cir. 2009).

After bench trial and pursuant to Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. Plaintiffs Martin Plancich and Dayna Plancich are married. In October 2010, Martin Plancich[1] was employed as a deputy with the SCSO. Plancich had been with the SCSO since 2002. He had no disciplinary record prior to October 2010.

2. Plancich publicly supported Herb Oberg, a candidate for Skagit County Sheriff in the November 2010 election. Oberg ran against Defendant William Reichardt, who was ultimately elected.

*The Dodge Valley House & October 2010 Incident*

3. Dayna's sister, Pam Hinton, is married to Greg Hinton. At a foreclosure auction on September 17, 2010, the Hintons purchased a home at 14022 Dodge Valley Road in Mount Vernon, Washington ("the Dodge Valley House").

4. Pam and Dayna discussed a plan for the Planciches to purchase the Dodge Valley House from the Hintons. The Planciches would be able to do so only if they could sell their home at the time. Shortly after the Hintons acquired the Dodge Valley House, the Planciches put their home up for sale.

5. The prior owners of the Dodge Valley House were Aaron and Jamie Reinstra. The Reinstras believed that they had 21 days—until October 8, 2010—to move out.

6. On October 6, 2010, Greg Hinton visited the Dodge Valley House to inspect the interior for damage. Aaron would not let him enter, and the police were called. Former SCSO Deputy Rhonda Lasley responded to the call and negotiated an agreement that the Reinstras would vacate by October 7 at 6:00 p.m.

---

[1] Given that the facts of this case primarily involve Martin Plancich, the Court herein refers to him as "Plancich." At times, the Court uses first names for the sake of clarity. No disrespect is intended.

7.  While Lasley was on the call, Plancich told her that he and Dayna would move in to the Dodge Valley House if they could sell their own home.

8.  On October 7, the Reinstras called the Hintons and said that they could not be out of the house that day. The Reinstras indicated that they would vacate by October 8.

9.  The Reinstras had hired a contractor, Gary Nelson, to install high-end fir doors in the Dodge Valley House. After the foreclosure, the Reinstras told Nelson that he could take back the doors because the Reinstras had not yet paid for them.

10. On the evening of October 7, Nelson drove his truck and trailer to the Dodge Valley House to retrieve the doors. Before leaving his home, Nelson tested the taillights on his trailer to make sure they were working. After removing the fir doors, Nelson installed replacement doors in the Dodge Valley House. Nelson finished loading the fir doors into his trailer sometime late that night or in the early morning hours of October 8.

11. Plancich was working the night shift on October 7. While on duty, he drove by the Dodge Valley House and observed Nelson loading the doors into his trailer. Plancich called SCSO Deputy Martin Steiner, who was also on duty. Plancich told Steiner that he saw a person loading doors from a vacant house into a trailer. Steiner advised Plancich to contact the person. Plancich responded that he was no longer in front of the house but that, when he turned to go back, the truck and trailer pulled out onto the roadway. Plancich did not disclose any involvement with the Dodge Valley House to Steiner.

12. Plancich pulled Nelson over. Plancich testified that he did so because Nelson's trailer had a flickering taillight. The Court does not find this testimony to be credible. Rather, the Court finds that Plancich committed a pretextual stop for the purpose of investigating the issue of the doors. This finding is based on Nelson's testimony that the taillight was working before the stop, as well as the next day; the unlikelihood that Plancich merely passed the Dodge Valley House by happenstance; Plancich's failure to be forthcoming with Steiner; and Plancich's interest in preserving property that was removed from a

house he hoped to purchase.

13. Steiner also responded to the stop. During the stop, Plancich asked Nelson about the doors. Steiner knew Nelson, so the deputies let him go without a ticket. Because Nelson drove home in the direction of the sheriff's office, Plancich was able to observe where Nelson took the doors.

14. The next morning, Plancich told Pam Hinton to call the police and report the missing doors. She did so, and SCSO Deputy Bart Moody and Sergeant Annette Lindquist responded. Pam and Plancich were both on the scene. Neither of them told Moody or Lindquist that the Reinstras still inhabited the Dodge Valley House at the time the doors were removed. Plancich also failed to disclose his intent to move into the house.

15. Based on the information provided, Moody and Lindquist concluded that the doors had been stolen. Lindquist instructed Moody and SCSO Deputy John Hamlin to recover the doors. Hamlin also did not know that Plancich intended to move into the house. Hamlin informed Nelson that he faced jail time and monetary penalties if he failed to return the doors. Shaken, Nelson rehung the doors on October 11, 2010.

16. Plancich and his family moved into the Dodge Valley House on October 23, 2010.

*Ensuing Investigations & Plancich's Termination*

17. Aaron Reinstra subsequently noticed Plancich's squad car parked in the driveway of the Dodge Valley House. Concerned about the way the investigation into the doors had been handled, Aaron called a friend who worked for the Skagit County Prosecutor's Office. The Skagit County Prosecutor's Office referred the matter to the Whatcom County Sheriff's Office, which began investigating the incident.

18. Plancich refused to speak to Whatcom County investigators about the doors incident. Two other deputies also refused. The Whatcom County Sheriff's Office ultimately found insufficient evidence to charge Plancich with criminal conduct.

19. The SCSO decided to conduct an internal investigation into whether Plancich, Lindquist,

Moody, or Hamlin committed misconduct during the doors incident. SCSO Undersheriff Gary Shand appointed Defendant Tom Molitor, SCSO Chief Deputy, to conduct the investigation.

20. In March and April of 2011, Molitor conducted two investigations, one into the doors incident, and another into whether Plancich had been truthful in the first investigation.

21. Molitor interviewed the four subjects of the investigation, as well as Steiner, Nelson, and Reinstra. Molitor cleared Lindquist and Moody of any wrongdoing. Molitor found that Hamlin was aggressive and coercive with Nelson, and Hamlin received a written warning.

22. Molitor ultimately recommended that Plancich be terminated. Molitor's recommendation was based on his findings that Plancich monitored the Dodge Valley House out of his own interest; stopped Nelson under pretext; withheld information to mislead fellow officers into believing the doors were stolen; and was evasive and untruthful during the internal investigation. Given the evidence presented at trial, the Court endorses these findings and adopts them here.

23. Reichardt accepted Molitor's recommendation and terminated Plancich on May 6, 2011.

*Treatment of Other SCSO Employees*

24. Visible supporters of Oberg included Plancich, Lindquist, Lasley, Moody, and former SCSO Sergeant Paul Arroyos. Visible supporters of Reichardt included SCSO Deputy Terry Esskew and former SCSO employee Amity Locken. Hamlin was not an open supporter of either candidate.

25. Lindquist testified that she experienced hostile behavior that she interpreted as politically based. This included a harsh reprimand from Molitor regarding Lindquist's response to a domestic violence call from Oberg's wife, as well as a "Proverb on Loyalty" hung in a threatening manner on Lindquist's greaseboard. Reichardt offered to look into the proverb incident, but because a week had already passed, Lindquist declined. Lindquist

also testified that she thought she would have been promoted to chief by now and that she was passed over for a lateral assignment. The Court finds Lindquist's testimony credible as to Molitor's harsh conduct and the threatening proverb. However, given Reichardt's response to the proverb incident and Lindquist's testimony that the lateral position went to a qualified candidate with more experience, the evidence does not show that Defendants made politically-based employment decisions with respect to Lindquist.

26. Lasley testified that she felt she was treated differently due to her support for Oberg, including reprimands for small issues or infractions that other employees also committed. However, the evidence showed that Lasley had a disciplinary record that warranted closer scrutiny. For example, she was written up for using office e-mail for personal matters, criminally investigated for giving a coworker her own prescription medication, and temporarily removed from her position for "t[aking] a swing at a detective at the police ball" while under the influence of alcohol. Lasley also testified that she never received criticism from Reichardt or Molitor. Further, Lasley was not terminated, but chose to resign from her position. Accordingly, Lasley's testimony does not establish that Defendants made politically-based employment decisions with respect to her.

27. Moody did not testify that he experienced negative treatment after Reichardt won the election. Although Moody testified about misconduct committed by SCSO Sergeant Don Marlow, that incident occurred several years before the election. And, Moody ultimately retired. Thus, Moody's testimony does not show that political support impacted any SCSO employee's treatment.

28. Arroyos testified that he felt his support for Oberg resulted in adverse consequences, like being the subject of an internal investigation. However, Arroyos admitted to committing the misconduct underlying the investigation, including Starbucks trips that were against SCSO policy and "probably" making untruthful statements during other investigations. Further, Arroyos's testimony tended to show that the hostility he felt came from a tense

personal relationship with Molitor, rather than Arroyos's political beliefs. And Arroyos, like Lasley, chose to resign. As such, Arroyos's testimony does not establish that Defendants made politically-based employment decisions with respect to him.

29. Given the evidence discussed in Paragraphs 25-28, the Court finds that Plancich failed to demonstrate that Defendants had a pattern of taking adverse employment actions against Oberg supporters. This finding is further supported by the fact that, although Lasley, Lindquist, and Moody were all involved in some capacity with the Dodge Valley House investigation, none of them suffered adverse employment actions as a result.

30. Turning to the Reichardt supporters, the evidence shows that Esskew was investigated, but not terminated, for serious misconduct. Specifically, Esskew obtained information about another agency's theft investigation and provided the information to his neighbor, who was the subject of that investigation. Molitor testified that the difference between Esskew's misconduct and Plancich's misconduct was that Esskew was forthcoming and admitted his misdeeds. By contrast, Molitor stated, Plancich tried to "obfuscate things" and "misdirect" him. The Court finds this explanation credible and supported by the recording of Plancich's interview. Accordingly, the disparity between the two investigations does not support Plancich's claim.

31. The sparse evidence presented on Locken shows that she was investigated for mishandling evidence and altering computer records and that she resigned before the investigation concluded. This does not demonstrate that Locken received favorable treatment based on her political leanings.

32. Given the evidence discussed in Paragraphs 30-31, the Court finds that Plancich failed to demonstrate that Defendants had a pattern of showing leniency to Reichardt supporters who committed misconduct.

33. Finally, Hamlin, who did not publicly support either candidate, was given only a warning for his conduct in the doors incident. Although Hamlin, unlike Plancich, had a prior

disciplinary record, he also had no personal involvement in the Dodge Valley House. The Court finds that Hamlin's lack of personal involvement—rather than his lack of support for Oberg—motivated Defendants' decision to punish Hamlin less severely than Plancich.

## II. CONCLUSIONS OF LAW

34. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

35. Venue is properly set in the United States District Court, Western District of Washington pursuant to 28 U.S.C. § 1391.

36. To state a First Amendment claim against a public employer, an employee must show: (1) the employee engaged in constitutionally protected speech; (2) the employer took an adverse employment action against the employee; and (3) the employee's speech was a substantial or motivating factor for the adverse action. *Lakeside-Scott*, 556 F.3d at 803.

37. Plancich engaged in constitutionally protected speech by supporting Oberg in the 2010 election for Skagit County Sheriff.

38. Defendants took an adverse employment action against Plancich by terminating his employment in May 2011.

39. Plancich has not met his burden to show that his political speech was the substantial or motivating factor for his termination. Rather, the Court concludes that the motivating factor for Plancich's termination was the misconduct he committed in October 2010 and his behavior during the ensuing investigation. This conclusion is supported by the Court's findings that Plancich committed misconduct warranting termination and that he failed to demonstrate politically-based disparate treatment among SCSO employees.

Accordingly, the Court finds in favor of Defendants. It is so ORDERED.

//

//

//

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PAGE - 8

1   DATED this 28th day of September 2016.

2

3

4

5

6

7

8

_____

John C. Coughenour
UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 9